# EXHIBIT A

Brian C. Johnson, #3936
H. Burt Ringwood, #5787
R. Roman Groesbeck, #12530
Brooke Johnson, #13761
STRONG & HANNI
9350 South 150 East, Suite 820
Sandy, Utah  84070
Telephone:  (801) 532-7080
Facsimile:  (801) 596-1508
*Attorneys for Plaintiff*

---

## IN THE THIRD JUDICIAL DISTRICT COURT,
## IN AND FOR SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| CYRUS SPURLINO, an individual,<br><br>      Plaintiff,<br><br>v.<br><br>HOLCIM (US) INC., a Delaware corporation, ASH GROVE CEMENT COMPANY, a Delaware corporation, and JOHN DOES I-V,<br><br>      Defendants. | **COMPLAINT AND JURY DEMAND**<br><br><br>Case No.:  140903475<br><br>Judge:  John Paul Kennedy |

Plaintiff Cyrus Spurlino ("Spurlino") complains of Defendants Holcim (US) Inc. ("Holcim"), Ash Grove Cement Company ("Ash Grove"), and Does I-V (collectively the "Defendants") as follows:

## SUMMARY OF THE CASE

1.      The above captioned action (the "Action") is brought by Spurlino as the successor in interest to the claims of Westroc, Inc. vis-à-vis Westroc Holdco, Inc.[1]

2.      At all times relevant to this Action, Spurlino was a purchaser of Portland cement ("Cement") and a producer and seller of ready mix concrete ("Concrete"), of which Cement is a primary ingredient.

3.      Spurlino purchased Cement from the Defendants at all times relevant to this Action.

4.      Defendants are and at all times relevant to this Action, producers and suppliers of Cement within the Utah Market, as more particularly defined below.

5.      Spurlino brings this Action against Defendants for money damages, including treble damages, as a result of Defendants' violations of the Utah Antitrust Act, Utah Code Ann. § 76-10-3101 *et seq*., and the Utah Unfair Practices Act, Utah Code Ann. 13-5-1 *et seq*..

6.      As more fully described below, the Defendants improperly contracted, combined, and conspired to use their collective market power to fix the prices of Cement for Spurlino and dozens of other similarly situated mid-level purchasers of Cement and producers of Concrete within the State of Utah (the "Utah Market") of like size and operation (together, the "Mid-Tier

---

[1] Spurlino is the assignee of any and all claims owned by or accrued to an entity known as Westroc Holdco, Inc., a Utah corporation ("WHI"), which arise out of the violations of Defendants identified in this Action pursuant to a Claims Assignment, as defined more particularly in this Complaint. WHI succeeded to such claims from an entity formerly known as Westroc, Inc., a Utah corporation. During all relevant times, Westroc, Inc. was a purchaser of Cement from Defendants and a producer and seller of Concrete and other related products in the Utah Market, as defined more particularly in this Complaint. However, by virtue of Spurlino's ownership of the claims identified generally above and in the Claims Assignment, Spurlino is treated in this Complaint as though he stands in the shoes of Westroc, Inc. vis-à-vis WHI.

Purchasers") at supracompetitive and economically unfeasible levels, thereby unreasonably restraining competition.

7.     Also as more fully described below, Defendants charged such supracompetitive prices to Spurlino, and, upon information and belief, to the Mid-Tier Purchasers, while, at the exact same time, and for the exact same Cement, charged a handful of top-level purchasers of Cement and producers of Concrete in the Utah Market (which grouping of purchasers comprise the largest, in terms of revenue, employees, assets, and similar qualifiers, Concrete suppliers in the Utah Market (the "Top-Tier Purchasers")) prices significantly below the levels those being charged to the Mid-Tier Purchasers.

8.     Top-Tier Purchasers are well-known purchasers of Cement in the Utah Market, and include, but are not limited to, the likes of Geneva Rock Products and Staker & Parson Companies.

9.     Spurlino and, upon information and belief, other Mid-Tier purchasers, were, as a direct consequence of Defendants' conduct, unable to effectively compete within the Utah Market against the Top-Tier Purchasers with respect to the production and sale of Concrete to consumers situated within that market, and competition in Utah has suffered substantial injury as a result.

10.     The Action is a Tier 3 action pursuant to Rule 8(a) and Rule 26 of the Utah Rules of Civil Procedure, as amended 2011.

## JURISDICTION AND VENUE

11.     Spurlino brings this action pursuant to Utah Code Ann. § 76-10-3101 *et seq*. and Utah Code Ann. § 13-5-1 *et seq.* to recover damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violations of the Utah Antitrust Act and the Utah Unfair Practices Act.

12.     Jurisdiction over this Action is properly vested with this Court pursuant to Utah Code Ann. §78A-5-102.

13.     Venue over this Action is, for among other reasons, properly vested with this Court pursuant to Utah Code Ann. §78B-3-307.

## PARTIES

14.     Spurlino is an individual residing in Florida at 7214 N. Mobley Rd., Odessa, FL 33556.

15.     Spurlino is the successor in interest to any and all claims of Westroc, Inc. arising out of violations alleged against Defendants vis-à-vis a claims assignment entered into with WHI dated effective September 6, 2013 (the "Claims Assignment").

16.     At all times relevant to the Action, Spurlino, individually or through his predecessors in interest WHI and/or Westroc, Inc., was a purchaser of Cement from Defendants and a producer and seller of Concrete and other related products in the Utah Market.

17.     Defendant Holcim is a registered Delaware corporation with its principal place of business at 201 Jonas Road, Waltham, Massachusetts 02451.

18.     Holcim is a subsidiary of Holcim Ltd., a Swiss company[2].

19.     Holcim is a producer and supplier of Cement in the Utah Market and Cement, asphalt, concrete and aggregates throughout Eastern, Southern and Midwest United States.

20.     Holcim maintains principal offices at, or otherwise has places of business in, Morgan County, Utah, Utah County, Utah, and Iron County, Utah.

21.     Holcim produces and/or sells Cement and such other materials from one or more locations within the aforementioned counties in Utah, including at 6055 East Croydon Road, Morgan, Utah 84050;  850 South 850 East, Lehi, Utah 84043; 3005 SR 56, Cedar City, Utah 84721.

22.     Defendant Ash Grove is registered Delaware corporation with its principal place of business at 11011 Cody Overland Park, Kansas 66210.

23.     Ash Grove, through itself and/or its subsidiaries, is a producer and supplier of Cement and packaged materials in the Utah Market and throughout the Pacific West, Midwest and Southern United States.

24.     Ash Grove maintains principal offices at, or otherwise has places of business in, Salt Lake County, Utah, and Millard County, Utah.

25.     Ash Grove produces and/or sells Cement and such other materials from one or more locations within the aforementioned counties in Utah, including at 4885 South 900 East,

---

[2] Notably, Holcim, currently the United States' fourth largest cement producer, and Lefarge SA, headquartered in France, currently the United States' third largest cement producer, have recently announced that the two companies will merge. Once the merger is finalized, the combined company will be the largest cement producer in the U.S. See http://www.bloomberg.com/news/2014-04-20/holcim-lafarge-leftovers-enticing-for-bidders-real-m-a.html.

#201, Salt Lake City, Utah 84117; 5216 South 100 West, Murray, Utah 84107; and Highway 132, Leamington, Utah 84638.

## CO-CONSPIRATORS

26.     Various other persons, firms or entities not yet identified as Defendants in the Action have participated as co-conspirators with Defendants in the offenses alleged in this Complaint and have performed acts and made statements in furtherance of the Defendants' conspiracy to manipulate process of Cement in an anti-competitive fashion.  Evidence of the identity of co-conspirators is in the possession of Defendants. When knowledge of such co-conspirators becomes known to Spurlino, he will amend this Complaint to add such individuals and entities or Defendants as parties to this Action.

## INTRASTATE TRADE AND COMMERCE

27.     At all relevant times to this Action, Defendants have produced and/or sold Cement and other materials within the Utah Market.

28.     One or more contemporaneous sales of Cement, each being of like grade and quality, between Defendants and Mid-Tier Purchasers and/or Defendants and Top-Tier Purchasers were made within the Utah Market.

29.     More specifically, such sales of Cement were, on more that one occasion, and for the purpose of use, consumption, and/or resale within the Utah Market:

> a.      made by Defendant Holcim from its location at 6055 East Croydon Road, Morgan, Utah 84050, contemporaneously to Spurlino, on the one hand,

and one or more of the Top-Tier Purchasers, on the other hand, and were effected within the Utah Market.

b.      made by Defendant  Holcim from its location at 850 South 850 East, Lehi, Utah 84043, contemporaneously to Spurlino, on the one hand, and one or more of the Top-Tier Purchasers, on the other hand, and were effected within the Utah Market.

c.      made by Defendant Ash Grove from its location at 4885 South 900 East, #201, Salt Lake City, Utah 84117 contemporaneously to Spurlino, on the one hand, and one or more of the Top-Tier Purchasers, on the other hand, and were effected within the Utah Market.

d.      made by Defendant Ash Grove from its location at 5216 South 100 West, Murray, Utah 84107, contemporaneously to Spurlino, on the one hand, and one or more of the Top-Tier Purchasers, on the other hand, and were effected within the Utah Market.

e.      made by Defendant Ash Grove from its location at Highway 132, Leamington, Utah 84638, contemporaneously to Spurlino, on the one hand, and one or more of the Top-Tier Purchasers, on the other hand, and were effected within the Utah Market.

30.     Based on these facts, the activities of Defendants alleged here, including each of the immediately forgoing sales, were made by Defendants, on the one hand, to Spurlino and one

or more of the Top-Tier Purchasers, on the other hand, within intrastate commerce in the State of Utah.

31.     Based on these facts, the activities of Defendants alleged here, including each of the immediately forgoing sales occurred within intrastate commerce as contemplated by the Utah Unfair Practices Act. Moreover, based on these facts and the facts set forth below, the activities of Defendants alleged herein have impaired economic activity involving or related to Cement in the Utah Market, together with the business activities carried on by Spurlino and other Mid-Tier Purchasers, each in the Utah Market.

32.     Consequently, the activities of Defendants alleged here had (and continue to have) a substantial effect on trade and commerce, and have unreasonably restrained (and continue to restrain) trade and commerce in violation of the Utah Antitrust Act.

## RELEVANT PRODUCT MARKETS

33.     There is one relevant product market in this instant action: Cement. The relevant geographic market, as previously indicated, is the Utah Market.

## MARKET POWER

34.     Upon information and belief, the Defendants possess at least ninety percent (90%) of the market share of total Cement sold to the Mid-Tier Purchasers and Top-Tier Purchasers in the Utah Market.

35.     Defendants consequently hold considerable market power and have been and are capable of dictating the price for Cement in the Utah Market, specifically as it relates to Cement to the Mid-Tier Purchasers and Top-Tier Purchasers of Cement.

## **PAST HISTORY OF ANTI-COMPETITIVE ACTIVITY BY THE DEFENDANTS**

36.     Defendants Holcim and Ash Grove are no strangers to direct allegations, implicit admissions, and governmental determinations of anti-competitive conduct.

37.     In January 2010, Defendant Holcim and/or its owned subsidiaries was named as a defendant in an action styled *In Re Florida Concrete and Cement Antitrust Litigation* (the "Florida Case").

38.     In the Florida Case, Defendant Holcim and the other named defendants were accused of, among other things, engaging in artificially maintaining high prices for cement in the relevant market by entering into a conspiracy together to fix cement prices for direct and indirect purchasers of cement in that market.

39.     After nearly thirty (30) months of litigation, the defendants in the Florida Case, including Defendant Holcim, settled the case on "undisclosed terms."

40.     On June 20, 2012, Defendant Holcim's wholly and/or partially owned subsidiary and/or affiliate in India was fined the equivalent of $1.1 billion by India's governmental compliance authority for anti-competitive activity, including the unfair price raising of cement.

41.     A governmental enforcement action (there was no private right of action to such an action in Brazil until recently) ongoing in Brazil for anti-competitive activity by cement producers, including Defendant Holcim, could result in a fine against the defendant cement producers of up to $413 million.

42.     The European Commission investigated a number of cement producers—including Defendant Holcim—for suspected violations of European Union antitrust laws from 2008 to 2010.

43.     In the case of *Ash Grove Company v. Federal Trade Commission*, 577 F.2d 1368 (9th Cir. 1978), a federal appeals court in the United States confirmed an FTC order requiring Defendant Ash Grove to divest itself of the acquisitions of two ready-mix concrete companies because of the negative competitive consequences of this acquisitions to cement producers.

44.     It is only fair that the Defendants' protestations in this instance—that their conduct can be viewed just as easily as legitimate independent competitive business activity as impermissible collusive anticompetitive activity—be viewed through the lens of their questionable track record with respect to compliance with U.S. anti-trust laws.

## GENERAL ALLEGATIONS

45.     Cement is the primary binding ingredient in a number of construction materials, including Concrete.

46.     Cement is a fine powder created by grinding clinker, the product of heating raw materials including limestone, in a kiln or other oven-type apparatus.

47.     Cement is typically sold in bulk by the ton (priced in dollars per ton) or in 94 lb. bags (priced in dollars per bag). Due to the Cement's high weight and low cost relative to volumes shipped, freight is a significant factor in the price at which Cement is sold.

48.     Cement is a commodity, produced and sold and traded throughout the United States and worldwide, including, among others, through major commodity indices and commodity brokers.

49.     Concrete is a mixture of Cement, its primary ingredient (by cost), and other materials including sand, gravel, and water.

50.     Concrete is most commonly produced at batch plants, and is typically made in one of two ways: where proportions of input materials are measured, combined with water, and then mixed in a large fixed drum, later to be placed in a rotating drum mounted on a truck which "agitates" the mixture on the way to the destination at which the Concrete is to be used, or, simply, where proportions of input materials are measured, combined with water directly in the rotating drum mounted on the truck, and then mixed in the truck's drum on the way to the destination at which the Concrete is to be used.

51.     In each of the forging instances, because the addition of water begins an irreversible chemical reaction, and because the Concrete is poured directly at the construction or other site, truck arrival must be timed so that the Concrete hardens at the appropriate time.

52.     Concrete is used primarily in commercial, governmental, and residential construction.

53.     The primary end users of Concrete in Utah are construction companies, of which there are hundreds, if not thousands, of varying types and sizes.

54.     Aside from small-scale, private construction projects like a driveway or patio, the Concrete sold to the construction companies described in the immediately preceding paragraph

of this Complaint and utilized in the vast majority of any substantial commercial, governmental, and residential construction in the Utah Market (e.g., roadways, commercial buildings, commercial and residential parking structures, highway and freeway retaining walls, airport runways, sewage utilities, curbing, building foundations, and the like) ("Construction Projects") is largely supplied by the Mid-Tier Purchasers, including, formerly, Spurlino, or the Top-Tier Purchasers.

55.    At all relevant times to this Action, the Cement needs in the Utah Market necessary to supply Concrete for Construction Projects are fulfilled primarily by Defendants, individually or collectively.

56.    At all relevant times to this action, Spurlino purchased Cement from both Defendants Holcim and Ash Grove.

57.    Upon information and belief, the specific price for Cement is not publicly disclosed or publicly advertised to potential purchasers.  Rather, a particular purchaser—whether a Top-Tier Purchaser or a Mid-Tier Purchaser—is provided a purportedly confidential pricing list on an annual basis.  This information is not generally known or disclosed to other purchasers or competing producers or sellers of Cement.

58.    At all relevant times to this Action, including, without limitation, on hundreds (if not thousands) of instances between January 1, 2008, through the date of this Action, Defendant Holcim supplied and sold to Spurlino and other Mid-Tier Purchasers, on the one hand, and to one or more of the Top-Tier Purchasers, on the other hand, from one or more of its locations within the Utah Market, Cement of like grade and quality, which sales often occurred within hours, if

not simultaneously, of one another, and in which the post-rebate per ton price for the Cement sold was approximately $15.00 per ton more for Spurlino and, upon information and belief, the other Mid-Tier Purchasers, than for the Top-Tier Purchasers.

59.     At all relevant times to this Action, including, without limitation, on hundreds (if not thousands) of instances between January 1, 2008, through the date of this Action, Defendant Ash Grove supplied and sold to Spurlino and the other Mid-Tier Purchasers, on the one hand, and to one of more of the Top-Tier Purchasers, on the other hand, from one or more of its locations within the Utah Market, Cement of like grade and quality, which sales often occurred within hours, if not simultaneously, of one another, and in which the post-rebate per ton price for the Cement sold was approximately $24.00 per ton more for Spurlino and, upon information and belief, the other Mid-Tier Purchasers, than for the Top-Tier Purchasers.

60.     Spurlino learned of the approximate $15.00 to approximate $24.00 per ton difference afforded to each of the Top-Tier Purchasers by Defendants for Cement of the exact same grade and quality, for the exact same quantities, and purchased at the exact same times, through one or more conversations with individuals intimately acquainted with the Cement pricing provided to such Top-Tier Purchasers by Defendants.

61.     But for the forgoing conversions with such individuals intimately acquainted with Cement pricing provided to such Top-Tier Purchasers by Defendants, Spurlino would not know of the discriminatory pricing for Cement afforded to each of the Top-Tier Purchasers by Defendants.

62.    This difference in pricing for Cement sold to Top-Tier Purchasers was not published, nor made publicly available, nor otherwise disclosed in any manner by Defendants to Spurlino or the other Mid-Tier Purchasers.

63.    Upon information and belief, although the price for Cement charged to Spurlino and the other Mid-Tier Purchasers by Defendants varied during relevant times to this Action, the price charged to Top-Tier Purchasers by Defendants consistently remained significantly less than the price charged to Spurlino and the other Mid-Tier Purchasers, being approximately $15.00 per ton to approximately $24.00 per ton less.

64.    At all relevant times to this action, the Cement supplied and sold to Spurlino and the other Mid-Tier Purchasers and to the Top-Tier Purchasers by Defendants was for use, consumption, or resale within the Utah Market.

65.    The Cement identified in the forgoing paragraphs and sold by the Defendants to Spurlino and the other Mid-Tier Purchasers was of like grade and quality to the Cement sold to the Top-Tier Purchasers.

### INSTANCES OF DEFENDANTS' ILLEGAL AND COLLUSIVE CONDUCT

66.    Beginning in at least January 1, 2008, if not earlier, and continuing on through the date of the instant Action (the exact dates being unknown at this time), upon information and belief, Defendants, in connection with their supplying Cement to Spurlino and the other Mid-Tier Purchasers and the Top-Tier Purchasers, contracted, combined, and/or conspired to use their collective market power to fix the prices of Cement for Spurlino and the other Mid-Tier Purchasers at supracompetitive and economically unfeasible levels, charging Spurlino and the

14

other Mid-Tier Purchasers an after rebate price of between approximately $15.00 per ton and approximately $24.00 per ton more than the Top-Tier Purchasers for purchases of the same Cement made by such purchasers at contemporaneous times.

67.     Despite the fact that the price Defendants charged for Cement was not published or otherwise publicly available, Defendants both consistently charged Spurlino and the other Mid-Tier Purchasers significantly more for Cement than Top-Tier Purchasers.

68.     Upon information and belief, the aforementioned price discrimination is effected pursuant to an explicit agreement between Defendants to charge Mid-Tier Purchasers, including Spurlino, significantly more for Cement that Top-Tier Purchasers.

69.     Although this is ostensibly parallel pricing that might occur in the marketplace as a consequence of competitive forces, the parallel pricing is curiously offered only to a subset of purchasers, and not all of them, and only on a confidentially-restrictive basis.

70.     For the purpose of forming and effectuating this contract, combination or conspiracy, Defendants, upon information and belief, did those things that they combined and conspired to do, including among others, the following:

       a.     participated in meetings and conversations to discuss the charging of disparate Concrete pricing to Spurlino and the other Mid-Tier Purchasers and the Top-Tier Purchasers for purchases of the same Cement made at the same times in the Utah Market;

b.  agreed to charge prices at certain levels and/or to otherwise raise, fix, maintain, or stabilize the prices of Concrete within the Utah Market, based on the type or status of the purchaser of such Concrete;

c.  sold Cement in the Utah Market at agreed upon prices and/or in accordance with agreed upon plans; and

d.  agreed to conceal and keep secret their illegal agreements.

71.  Upon information and belief, Defendants initial discussions and agreements to conspire regarding such price fixing and discrimination amongst and between Spurlino and the other Mid-Tier Purchasers, on the one hand, and the Top-Tier Purchasers, on the other hand, has led naturally to a pattern, for years, if not longer, of close collaboration among such competitors with respect to all facets of the Defendants' respective production and supply of Cement within the Utah Market.

72.  Defendants illegal and collusive acts have been caused by a horizontal collaboration among competing producers and suppliers of Cement in the Utah Market, including Defendants Holcim and Ash Grove, who have used their collective market power to gain agreements or understandings with one another relating to the price fixing and discrimination perpetrated amongst and between Spurlino and the other Mid-Tier Purchasers, on the one hand, and the Top-Tier Purchasers, on the other hand.

73.  Moreover, Defendants, through charging disparate prices for the sale of Cement of like grade and quality, at the same times, to Spurlino, and other Mid-Tier Purchasers, on the one hand, and one or more of the Top-Tier Purchasers, on the other hand, have engaged in

discriminatory pricing which is impermissible and unnecessarily restricts competition in the Utah Market.

74.     Defendants and their co-conspirators have engaged in the activities described in the forgoing paragraphs in furtherance of their antitrust violation and for the purpose of effectuating the unlawful contract, combination and/or conspiracy, and the illegal price discrimination described herein.

## EFFECTS OF DEFENDANTS' ILLEGAL AND COLLUSIVE CONDUCT

75.     Defendants' contract, combination and/or conspiracy, and their price discrimination, has had the following effects, among others:

a.     Defendants and their co-conspirators sold Cement in the Utah Market at artificial, disparate, and non-competitive price levels;

b.     Spurlino, Mid-Tier Purchasers, and other direct purchasers of Cement from Defendants were deprived of the benefit of free and open competition in the Utah Market for Cement;

c.     price competition in the sale of Cement among sellers, purchasers, and consumers in the Utah Market was restrained, suppressed and/or eliminated;

d.     costs of entry into the Utah Market relative to the supply of Cement, and, thus, Concrete, to Construction Projects has been significantly increased, which has impeded competition related thereto and erected artificial barriers to entry into the sale of Concrete in the Utah Market; and

e.  information that would enable primary end users of Concrete in Utah to make informed price and product comparisons between competing products has been suppressed or restrained.

76.  As a proximate result of Defendants' antitrust violations, Spurlino, like other Mid-Tier Purchasers competing in the Utah Market, was injured and financially damaged in his business and property, in that, among other things, he paid exorbitantly more for Cement than he would have paid in the absence of Defendants' unlawful conduct, and in that he was forced to compensate for such inflated prices of Cement in connection with his bidding on and completing Construction Projects on which he supplied Cement vis-a-vis Concrete, among other things.

77.  For example, Spurlino regularly submitted bids for Construction Projects based on the price of Cement conveyed to him by Defendants.

78.  On numerous occasions, Spurlino was informed by a potential purchaser of his materials and services that his bid for a Construction Project would be rejected because the cost of Concrete as identified in the bid was significantly higher than that identified in a Top-Tier Purchaser's competing bid.

79.  In certain instances, and in an effort to make his bid more attractive and ultimately secure the work upon which the bid was based, Spurlino would reduce the sales price of the Concrete component of the bid (to the extent the he would necessarily suffer a loss on that component of the bid) in order to accommodate the potential purchaser and ultimately to win the award for the work on the Construction Project.

80.     In other instances, where, for example, Spurlino was not able or willing to compensate for the price of Cement by reducing the sales price of the Concrete component of a bid for a Construction Project, Spurlino's bid was rejected and his ability to secure the work was consequently eviscerated. In those instances where Spurlino would reduce the sales price of the Concrete component of a bid in order to accommodate the potential purchaser and ultimately to win the award for the work on a Construction Project, Spurlino accepted and bore the loss on the Cement purchase from Defendants in order to continue operating his business and competing within the Utah Market.

81.     Upon information and belief, other Mid-Tier Purchasers have similarly had to reduce the sales price of the Concrete component of their bids on Construction Projects to compete with Top-Tier Purchasers who are able to charge less for Cement, and, resultantly, Concrete, due to the disparate pricing afforded to the Top-Tier Purchasers by Defendants.

82.     Upon information and belief, one or more Top-Tier Purchasers were able to, and, in many instances did, provide a lower bid for the Construction Projects on which Spurlino submitted a bid because such Top-Tier purchasers had purchased, or had the ability to purchase, Cement from Defendants at prices significantly less than those charged to Spurlino.

**FIRST CAUSE OF ACTION**
**Violations of the Utah Antitrust Act**

83.     Spurlino realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs 1 through 82 of this Complaint.

84.     Collectively, the Defendants hold a dominant position in the Utah Market and surrounding areas which, by virtue of their entering into agreements with one another to effect the same, are sufficient to charge prices at certain levels and/or to otherwise raise, fix, maintain, or stabilize the prices of Cement and Concrete within the Utah Market, and actually restrict competition.

85.     Defendants, in connection with their supplying Cement to Spurlino and the other Mid-Tier Purchasers and the Top-Tier Purchasers, have contracted, combined, and/or conspired to use their collective market power to fix the prices of Cement for Spurlino and the other Mid-Tier Purchasers at supracompetitive and economically unfeasible levels, charging Spurlino and the other Mid-Tier Purchasers an after rebate price of between approximately $15.00 per ton and approximately $24.00 per ton more than the Top-Tier Purchasers for purchases of Cement of like grade and quality made by such purchasers at contemporaneous times.

86.     Specifically, because the price of Cement is not public information, Defendants charging of Mid-Tier Purchasers, including Spurlino, more for Cement than Top-Tier Purchasers was not publicly known.

87.     In fact, Defendants would not have known that they were both charging Mid-Tier Purchasers, including Spurlino, more for Cement than Top-Tier Purchasers unless they had contracted, combined and/or conspired to agree to this scheme.

88.     The purpose and effect of the Defendant contracts, combinations and/or conspiracies has been to illegally restrict competition in the sale of Cement in the Utah Market to Spurlino and other Mid-Tier Purchasers, among others.

89.     By engaging in the illegal and collusive activities described herein, Defendants have unreasonably restrained competition, and have otherwise impaired economic activity involving or related to Cement in the Utah Market as well as business activities carried on by Spurlino and other Mid-Tier Purchasers, in the following ways, among others:

a.      Defendants and their co-conspirators sold Cement in the Utah Market at artificial, disparate, and non-competitive price levels;

b.      Spurlino and other direct purchasers of Cement from Defendants were deprived of the benefit of free and open competition in the Utah Market for Cement;

c.      price competition in the sale of Cement in the Utah Market was restrained, suppressed and/or eliminated;

d.      costs of entry into the Utah Market relative to the supply of Cement, and, thus, Concrete, to Construction Projects has been significantly increased, which has impeded competition related thereto; and

e.      information that would enable primary end users of Concrete in Utah to make informed price and product comparisons between competing products has been suppressed or restrained.

90.     By engaging in the illegal and collusive activities described herein, Defendants have burdened, and continue to burden, competition among Spurlino and the other Mid-Tier Purchasers, on the one hand, and the Top-Tier Purchasers, on the other hand, in the Utah Market without advancing any laudable or legitimate public interest.

21

91.     By engaging in the illegal and collusive activities described herein, Defendants have placed, and continue to place, a burden on trade and commerce, as evidenced among the dealings between suppliers, distributors, and/or purchasers of Cement throughout the Utah Market.

92.     By engaging in the illegal and collusive activities described herein, Defendants are engaged in violations of the Utah Antitrust Act, Utah Code Ann. § 76-10-3101 *et seq.*

93.     As a direct result of Defendants' violations of the Utah Antitrust Act, Spurlino has suffered substantial economic loss and damage to his trade and business, in an amount to be proven at trial, and is entitled to recover treble damages and costs of suit, including reasonable attorneys' fees pursuant to Utah Code Ann. § 76-10-3109.

## SECOND CAUSE OF ACTION
### Violations of the Utah Unfair Practices Act

94.     Spurlino realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs 1 through 93 of this Complaint.

95.     The Defendants are engaged in the business of producing and supplying, among other things, Cement, to Mid-Tier Purchasers, including Spurlino, and Top-Tier Purchasers in the Utah Market.

96.     Spurlino and one or more of the Mid-Tier Purchasers are competitors of the Top-Tier Purchasers.

97.     Cement is a commodity.

98.     At all relevant times to this action, Defendant Holcim supplied and sold to both Spurlino and the other  Mid-Tier Purchasers, on the one hand, and one or more of the Top-Tier Purchasers, on the other hand, from one or more of its locations within the Utah Market, Cement of like grade and quality, which sales often occurred within hours, if not simultaneously, of one another, and in which the post-rebate per ton price for the Cement sold was approximately $15.00 per ton more for Spurlino and, upon information and belief, the other Mid-Tier Purchasers, than for the Top-Tier Purchasers.

99.     At all relevant times to this action, Defendant Ash Grove supplied and sold to both Spurlino and the other Mid-Tier Purchasers, on the one hand, and one or more of the Top-Tier Purchasers, on the other hand, from one or more of its locations within the Utah Market, Cement of like grade and quality, which sales often occurred within hours, if not simultaneously, of one another, and in which the post-rebate per ton price for the Cement sold was approximately $24.00 per ton more for Spurlino and, upon information and belief, the other Mid-Tier Purchasers, than for the Top-Tier Purchasers.

100.     At all relevant times to this action, the Cement supplied and sold to Spurlino and the other Mid-Tier Purchasers and to the Top-Tier Purchasers by Defendants was for use, consumption, or resale within the Utah Market, and was so used, consumed and/or resold within the Utah Market.

101.     Such Cement referenced in the immediate preceding paragraph was supplied and sold in intrastate commerce in the State of Utah.

102.    Spurlino has been precluded from effectively competing in the supply of Concrete to Construction Projects in the Utah Market on account of the Defendants' discriminatory pricing practices, including their refusal to offer Spurlino terms and pricing for Cement of like grade and quality comparable to those enjoyed by the Top-Tier Purchasers and instead offering only terms and pricing that are financially onerous and unsupportable by the Utah Market.

103.    By engaging in the illegal and collusive discriminatory pricing practices described herein, Defendants are engaged in violations of the Utah Unfair Practices Act, Utah Code Ann. § 13-5-1 *et seq.*

104.    As a direct result of Defendants' violations of the Utah Unfair Practices Act, Spurlino has suffered substantial economic loss and damage to his trade and business, in an amount to be proven at trial, and is entitled to recover damages and costs of suit pursuant to Utah Code Ann. § 13-5-14.

### THIRD CAUSE OF ACTION
#### Fraudulent Concealment

105.    Spurlino realleges and incorporates herein by reference the allegations set forth in the preceding paragraphs 1 through 104 of this Complaint.

106.    Until shortly before April of 2013, Spurlino had no knowledge of any of the violations of Defendants described in this Complaint.

107.    Spurlino, until recently, could not have discovered, by the exercise of reasonable diligence, that Defendants had engaged in the violations alleged in this Complaint since

Defendants and their co-conspirators fraudulently concealed these violations so as to obscure their illegal activity.

108.    Spurlino could not have discovered the contract, combination and/or conspiracy of Defendants at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques secretly employed by Defendants to avoid detection thereof, and to fraudulently conceal their contract, combination and/or conspiracy and other illegal acts.

109.    The affirmative actions of the Defendants described in this Complaint were wrongfully concealed and carried out in a manner that precluded detection.

110.    Defendants engaged in a successful, illegal antitrust conspiracy that, by its nature, was inherently self-concealing.

111.    By virtue of the fraudulent concealment by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims that Spurlino has as a result of the illegal acts alleged in this instant action.

WHEREFORE, Spurlino prays as follows:

1.    On Spurlino's First Cause of Action, that the complained contract, combination or conspiracy and the acts done in the furtherance thereof by Defendants be adjudged to be in violation of the Utah Antitrust Act; that Defendants be held jointly and severally liable therefor; and that Spurlino recover damages in an amount proved and to be trebled as provided by law.

2.    On Spurlino's Second Cause of Action, that the complained discriminatory pricing practices engaged in by Defendants be adjudged to be in violation of the Utah Unfair

Practices Act; that Defendants be held jointly and severally liable therefor; and that Spurlino recover damages as proved as provided by law.

3.      On Spurlino's Third Cause of Action, that the complained actions of Defendants be adjudged to constitute fraudulent concealment; that the running of any statute of limitations with respect to any claims that Spurlino has as a result of the illegal acts alleged in this instant action against Defendants has been tolled and suspended; that Defendants be held jointly and severally liable therefor; and that Spurlino recover damages as proved as provided by law.

4.      Attorney fees and costs of suit.

5.      Punitive damages.

6.      For such other and further relief as the Court determines to be just and proper.

## JURY DEMAND

Spurlino hereby requests the matter be tried to a jury, pursuant to Rule 38(b) of the Utah Rules of Civil Procedure.

DATED this 22nd day of May, 2014.

STRONG & HANNI, P.C.

/s/ Brian C Johnson

_____
Brian C Johnson
H. Burt Ringwood
R. Roman Groesbeck
Brooke Johnson
*Attorneys for Plaintiff*