IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CYRUS SPURLINO, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>HOLCIM (US) INC., a Delaware corporation;<br>ASH GROVE CEMENT COMPANY, a<br>Delaware corporation; and JOHN DOES I-V;<br><br>Defendants. | Case No. 2:14-cv-461<br><br>MEMORANDUM DECISION AND<br>ORDER GRANTING DEFENDANTS'<br>MOTION FOR SUMMARY<br>JUDGMENT AND DENYING<br>PLAINTIFF'S CROSS-MOTION FOR<br>SUMMARY JUDGMENT<br><br>District Judge Jill N. Parrish |

## INTRODUCTION

Before the court are Defendants Holcim (US), Inc. and Ash Grove Cement Company's

motion for summary judgment (Dkt. No. 79), and Plaintiff Cyrus Spurlino's cross-motion for

summary judgment (Dkt No. 117). The court held oral argument on the motions on July 19,

2017.

At issue is whether Spurlino has standing to bring a claim arising under the Utah Unfair

Practices Act. As explained below, the court GRANTS Defendants' motion for summary

judgment and DENIES Spurlino's cross-motion for summary judgment.

## BACKGROUND

Plaintiff Cyrus Spurlino ("Spurlino") was the majority shareholder (and later sole

shareholder) of Westroc, Inc., a company that produced, distributed and sold ready-mix concrete

and provided related services. Defendants are suppliers of cement, a primary ingredient in

concrete. From at least 2008 through April 2013, Westroc, Inc. purchased cement from

Defendants for use in its production of concrete. This lawsuit stems from Spurlino's allegation

that Defendants engaged in price discrimination by charging Westroc, Inc. a higher price for cement than Defendants charged other, larger concrete companies, in violation of the Utah Unfair Practices Act, Utah Code §§ 13-5-1 et seq. (the "UUPA"). Spurlino's requested relief for the alleged pricing discrimination is "that the complained discriminatory pricing practices engaged in by Defendants be adjudged to be in violation of the Utah Unfair Practices Act; that Defendants be held jointly and severally liable therefor; and that Spurlino recover damages in an amount proved and to be trebled as provided by law." (Dkt. No. 11, 21).

In April 2013, non-party Kilgore Companies, LLC ("Kilgore") entered into a membership interest purchase agreement ("MPA") with Westroc, LLC,[1] Westroc Holdco, Inc. ("Holdco"),[2] the Cyrus W. Spurlino Revocable Trust (the "Trust"), Cyrus W. Spurlino, as Trustee of the Trust, as the sole shareholder of Holdco, and as the former sole shareholder of Westroc, Inc., and Cyrus W. Spurlino, an individual. In preparation for closing, Westroc, Inc. filed articles of conversion on March 29, 2013, converting itself from a Utah corporation into a Utah limited liability company known as Westroc, LLC. The parties closed on the MPA on April 1, 2013. Westroc, LLC merged into Kilgore on April 2, 2013.

Spurlino's complaint alleges that he is bringing this action "as the successor in interest to the claims of Westroc, Inc., vis-à-vis Westroc Holdco, Inc." (*Id.* at 2). To that end, Spurlino alleges that Holdco succeeded to certain antitrust claims (including the UUPA claim) from Westroc, Inc. and that he is the assignee of any and all claims owned by or accrued to Holdco

---

[1] Westroc, Inc., a Utah Corporation, was converted into a limited liability company on March 29, 2013, becoming Westroc, LLC, a Utah Limited Liability Company. As explained below, Kilgore requested the conversion for tax purposes.

[2] Westroc Holdco, Inc. was incorporated on March 27, 2013, with Cyrus Spurlino as its sole shareholder.

pursuant to a Claims Assignment[3] dated August 8, 2013. Defendants argue that Holdco never succeeded to any claims of Westroc, Inc., and therefore Holdco could not have assigned those claims to Spurlino. Thus, Defendants argue that Spurlino lacks standing to bring his UUPA claim. Spurlino maintains that he has standing by virtue of the Claims Assignment because Holdco did succeed to the claims owned by Westroc, Inc.

## ANALYSIS

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering cross-motions for summary judgment, the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (citations omitted). Further, the court must "construe the evidence and the reasonable inferences drawn therefrom in the light most favorable to the nonmovant." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002) (citation omitted); *see also Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013) ("The nonmoving party is entitled to all reasonable inferences from the record.").

The UUPA provides:

It is unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition

---

[3] The Claims Assignment purports to assign certain anti-trust claims under the Sherman Act, the Robinson-Patman Act, the Utah Antitrust Act, and the UUPA from Holdco to Spurlino.

with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

Utah Code § 13-5-3.

The UUPA addresses standing to bring suit in § 13-5-14:

Any person or the state of Utah may maintain an action to enjoin a continuance of any act in violation of this chapter, and, if injured by the act, for the recovery of damages. If, in such action, the court finds that the defendant is violating or has violated any of the provisions of this chapter, it shall enjoin the defendant from a continuance of the violation. It is not necessary that actual damages to the plaintiff be alleged or proved. In addition to such injunctive relief, the plaintiff is entitled to recover from the defendant three times the amount of the actual damages sustained or $2,000, whichever is greater, plus court costs.

*Id.* § 13-5-14.

Defendants argue that because Spurlino is not a purchaser of commodities or a successor in interest to a purchaser of commodities, he has not suffered an injury that grants him Article III standing. Federal courts are limited to deciding actual cases or controversies. U.S. Const. art. III, § 2. Thus, a litigant must demonstrate that "he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013) (citation omitted).

Spurlino does not contend that he was a purchaser of concrete or that he was personally injured by the alleged conduct of Defendants. Rather, he asserts standing as a successor in interest to the claims of Westroc, Inc. Defendants concede, for purposes of their motion for summary judgment, that Westroc, Inc. would have standing to bring a UUPA claim if it still existed. The court must therefore determine who is the successor in interest to Westroc, Inc.'s claim. The court concludes that Westroc, LLC succeeded to the claim when Westroc, Inc. converted to Westroc, LLC. When 100% of the membership interests of Westroc, LLC were sold to Kilgore pursuant to the MPA, Kilgore became the sole member of Westroc, LLC and

successor in interest to the claim. The claim was never assigned or transferred to Holdco by Westroc, Inc., Westroc, LLC, or Kilgore. Because Holdco never succeeded to the claims of Westroc, Inc., the Claims Assignment from Holdco to Spurlino was a nullity.

## I. Westroc, LLC Succeeded to All Claims of Westroc, Inc. as a Result of Westroc, Inc.'s Conversion to a Limited Liability Company

Spurlino asserts that only identified, operational assets were transferred Westroc, LLC in preparation for the eventual sale to Kilgore. (Dkt. No. 138, 2). According to Spurlino, because the UUPA claim was not an identified, operational asset of Westroc, Inc., it was not transferred to Westroc, LLC when Westroc Inc. converted to Westroc, LLC. In essence, Spurlino argues that the parties' intent in creating Westroc, LLC as a pass-through entity dictated which assets were transferred to Westroc, LLC upon conversion, and which were not. This argument is contrary to the fundamental principles of an entity conversion under the Utah Code.

The Utah Revised Limited Liability Company Act in effect at the time of the conversion provided:

> When any conversion shall have become effective under this section, for all purposes of the laws of this state, all of the rights, privileges, and powers of the subject entity that has converted, and all property, real, personal, and mixed, and all debts due to the subject entity, as well as all other things and *causes of action* belonging to the subject entity, shall remain vested in the domestic company to which the subject entity has converted and shall be the property of the domestic company, and the title to any real property vested by deed or otherwise in the subject entity shall not revert or be in any way impaired by reason of this chapter or of the conversion . . . .

Utah Code § 48-2c-1403(3) (2010) (emphasis added).[4]

Under the statute, neither the parties' intent nor the terms of the MPA are relevant to determining which property belonged to Westroc, LLC after Westroc, Inc.'s conversion. The

---

[4] The current version of the statute, the Utah Revised Uniform Limited Liability Company Act, is functionally equivalent to the prior version. It states that "all property of the converting entity continues to be vested in the converted entity without transfer, reversion or impairment." Utah Code § 48-3a-1046(1)(b).

statute plainly states that upon conversion, "*all* property . . . as well as all other things and *causes of action* belonging to the subject entity [Westroc, Inc.] . . . remain vested in the domestic company to which the subject entity has converted [Westroc, LLC] and shall be the property of the domestic company [Westroc, LLC]." Thus, by operation of law, any asset or cause of action that belonged to Westroc, Inc. at the time of conversion vested in and became the property of Westroc, LLC.

In an apparent attempt to avoid the clear consequence of conversion dictated by the statute, Spurlino asserted at the hearing on this matter that if all of Westroc, Inc.'s assets became the property of Westroc, LLC by operation of law, then certain assets excluded from the sale under the MPA[5] (the "Excluded Assets") would now belong to Kilgore because there are no documents conveying them from Westroc, LLC to Holdco. According to Spurlino, because these Excluded Assets belonged to Holdco after the MPA was executed, only operational assets were transferred to Westroc, LLC upon conversion. The court is not persuaded.

It is undisputed that the Excluded Assets were, in fact, conveyed or distributed to Holdco. On March 29, 2013, the Excluded Properties were conveyed to Holdco by warranty deed. The warranty deed listed the grantor as "Westroc, Inc. also known as Westroc, LLC.[6]" (Dkt. No. 126-2, Ex. A). Further, MPA § 2.10 provided that any cash "that could have been, but was not distributed to Sellers prior to Closing . . . shall be distributed to Holdco no later than fourteen (14) days after the Closing." Thus, contrary to Spurlino's argument, the Excluded Assets were conveyed or distributed to Holdco prior to or as a result of the transaction with Kilgore. But even

---

[5] The MPA specifically excluded certain office buildings and land in Pleasant Grove, Utah (the "Excluded Properties"), and all cash belonging to Westroc, LLC from the transaction with Kilgore. Those excluded assets are defined in the MPA as the "Excluded Assets."

[6] The articles of conversion were also filed on March 29, 2013. By listing both entities as grantors, the parties ensured that regardless of which transaction was recorded first, the Excluded Properties would be conveyed to Holdco.

if they had not been conveyed, that fact would not change the effect of a conversion under Utah law, i.e., that all property and causes of action belonging to a converting entity vest in and belong to the new entity upon conversion. Other agreements, desires, or intentions notwithstanding, the legal consequences of the conversion under the Utah Code are clear. The court therefore concludes that Westroc, LLC was the successor in interest to all property—including causes of action—that Westroc, Inc. held when it converted to Westroc, LLC.

## II.     The MPA Is Unambiguous and Effectuates the Sale of 100% of Westroc, LLC's Membership Interests and Non-Excluded Assets

Defendants argue that Westroc, LLC was sold in its entirety to Kilgore pursuant to the MPA. Consequently, any claims owned by Westroc, LLC were transferred to Kilgore. Spurlino disagrees with Defendants' characterization of the transaction. Although titled a Membership Interest Purchase Agreement, Spurlino asserts that the MPA was, in substance, a sale of specific operational assets to Kilgore. Spurlino maintains that, at a minimum, the absence of specific language addressing claims or causes of action (and even more specifically, anti-trust claims) creates an ambiguity, which cannot be resolved on summary judgment.

### A.     The language of the MPA is clear and unambiguous and demonstrates that it was a membership purchase agreement

Section 8.3 of the MPA states that "[t]his Agreement shall be governed by and construed and enforced in accordance with the internal, substantive laws of the State of Delaware . . . ." Accordingly, the court applies Delaware law to interpret the MPA and determine whether an ambiguity exists therein. Under Delaware law, "[a] determination of whether a contract is ambiguous is a question for the court to resolve as a matter of law." *HIFN, Inc. v. Intel Corp.*, No. Civ.A. 1835-VCS, 2007 WL 1309376, at *9 (Del. Ch. May 2, 2007) (citing *Reardon v. Exch. Furniture Store, Inc.*, 188 A. 704, 707 (Del. 1936)).

"When interpreting a contract, the court's ultimate goal is to determine the parties' shared intent." *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008) (citation omitted). "Where the contract language is clear and unambiguous, the parties' intent is ascertained by giving the language its ordinary and usual meaning." *Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citation omitted). Contracts are "ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) (citation omitted). But, "[w]hen the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation, that interpretation controls the litigation." *Sassano*, 948 A.2d at 462 (citation omitted). If the court determines that the contract is unambiguous, "extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (citation omitted). Further, the court is required to "construe the agreement as a whole, giving effect to all provisions therein. The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) (internal quotation marks and citations omitted).

With this legal standard in mind, the court turns to the MPA. Defendants argue that "there is only one sensible meaning that can be given to the language of the MPA—Kilgore purchased Westroc, LLC in its entirety, other than those assets or liabilities that were specifically excluded, when it purchased Westroc, LLC's outstanding membership interests." (Dkt. No. 125 at 47). In support, Defendants rely on MPA Recital D ("Holdco desires to sell, and [Kilgore]

desires to acquire, respectively, 100% of the [membership interests in Westroc, LLC]"); MPA § 2.1 (stating that Holdco would transfer 100% of Westroc, LLC's membership interests on the closing date); and MPA §2.4 (explaining that the entire purchase price was consideration for the transfer of 100% of Westroc, LLC's membership interests).

Spurlino responds that the form of the MPA should not trump the substance of the parties' agreement. Spurlino asserts that the MPA is in substance an asset sale and not a membership interest transfer. (Dkt. No. 118 at 5). In support, Spurlino repeatedly points to MPA § 3.6(a), which states that only the "assets . . . used or held for use in the operation of the Business" were conveyed through the MPA. According to Spurlino, because the entirety of the purchase price was allocated to operational assets, the court should construe the MPA as an asset sale.

Spurlino's reliance on MPA § 3.6(a) is unavailing. MPA § 3.6(a) is not a comprehensive list of operational assets purchased by Kilgore. Rather, MPA § 3.6(a) is a representation by Westroc, LLC to Kilgore that it holds good title to all of the assets used in the operation of the business. This type of representation is entirely consistent with a membership purchase agreement whereby the entirety of an entity is sold. Furthermore, Spurlino's argument ignores the operative language contained in MPA § 2.4, which explicitly allocates the entirety of the purchase price to the membership interests, not operational assets.

Spurlino further argues that MPA § 2.9, and related Schedule 2.9, which allowed Kilgore to receive a step-up in basis for tax purposes, demonstrates that the substance of the MPA was an asset sale. However, MPA § 2.9 and its related schedule merely allocate the purchase price to categories of assets for tax reporting purposes. There is no indication that the assets listed in Schedule 2.9 were the *only* things being purchased. On the contrary, these assets are included in

the sale of the entirety of Westroc, LLC. Noticeably absent from the MPA is any language of conveyance of specific assets. And there were no bills of sale for assets as would normally be included with a sale of assets. Rather, the only language indicating any kind of conveyance is found in MPA § 2.4, which states that the purchase price is to be paid "in consideration of the sale, conveyance, assignment, transfer and delivery of [100% of the membership interests of Westroc, LLC]."

Finally, the court addresses Spurlino's argument that the broad indemnification provision provided in MPA § 6.1 is evidence of an asset sale. Contrary to Spurlino's assertion, such an indemnification provision is not inconsistent with the transfer of 100% of the membership interests. In fact, such a provision would be unnecessary in an asset sale because the general rule is that "[w]here one company sells or otherwise transfers all its assets to another company, the latter is not responsible for the debts and liabilities of the transferor." *Decius v. Action Collection Serv., Inc.*, 105 P.3d 956, 958 (Utah Ct. App. 2005) (brackets omitted). *See also* John H. Matheson, *Successor Liability*, 96 Minn. L. Rev. 371 (2011) ("Asset sales transactions have various benefits, one of which is that the purchaser presumptively does not assume any of the seller's liabilities as part of the purchase transaction. With respect to this ability to purchase assets without also assuming liabilities, the Supreme Court declared over 120 years ago that '[t]his doctrine is so familiar that it is surprising that any other can be supposed to exist.'" (quoting *Fogg v. Blair*, 133 U.S. 534, 538 (1890))).

Finally, even assuming that the provisions of the MPA highlighted by Spurlino could be interpreted to support the conclusion that the MPA effectuated an asset sale, that fact would not alter the analysis. The court must construe the agreement as a whole, giving effect to all provisions therein." *GMG Capital Invs.*, 36 A.3d at 779. "The meaning inferred from a particular

provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan." *Id.* The MPA's "overall scheme or plan" is embodied in the clear and unambiguous statement of intent contained in Recital D: Holdco desires to sell, and [Kilgore] desires to acquire, respectively, 100% of [the membership interests of Westroc, LLC]." All other provisions of the MPA, including those relied upon by Spurlino, are given effect and are consistent with that overarching statement of intent. Therefore, when reading the MPA as a whole, the court concludes that substance of the transaction comports with the clear and unambiguous language in the MPA and effectuated a transfer of 100% of the membership interests in Westroc, LLC.

### B. Westroc, LLC's claim was transferred to Kilgore under the MPA

The court next addresses whether all assets, including legal claims, are transferred in the sale of all of a limited liability company's membership interests. While there is no controlling case law explicitly addressing whether all assets are transferred through the sale of all of a limited liability company's membership interests, "it is a general principle of corporate law that all assets and liabilities are transferred in the sale of a company effected by a sale of stock . . . ." *In re KB Toys Inc.*, 340 B.R. 726, 728 (D. Del. 2006). *See also Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 365 (3d Cir. 2002) ("by purchasing LCSDI's stock, and not just its assets, Kool Mann agreed to pay a particular price for LCSDI as a whole—its assets and liabilities."); *In re Publ'n Paper Antitrust Litig.*, No. 3:04md1631 (SRU), 2013 WL 3155371, at *3 (D. Conn. June 20, 2013) ("Because the transaction at issue was effectuated through a stock purchase agreement, the plaintiffs concede that, unless otherwise agreed, all of SENA's assets and liabilities transferred automatically with its stock from SEO . . . ."). And when resolving legal questions regarding limited liability companies, the Tenth Circuit looks to relevant principles of corporate law. *See Shelter Mortg. Corp. v. Castle Mortg. Co., L.C.*, 117 F. App'x 6, 13 (10th Cir.

2004) ("[W]e will be guided by Utah's corporate law" in deciding a legal issue concerning the Utah Limited Liability Company Act).

The sale of a limited liability company's membership interests is equivalent to the sale of one hundred percent of a corporation's stock. *See Excellence Cmty. Mgmt. v. Gilmore*, 351 P.3d 720, 722 (Nev. 2015) (concluding "that the 100–percent membership sale of the LLC that took place in this case is equivalent to the sale of 100 percent of the stock in a corporation"); *Missett v. Hub Int'l Pa.., LLC*, 6 A.3d 530, 537 (Pa. 2010) ("[W]e find the structure of the sale of equity membership interests . . . to be akin to a sale of stock rather than an asset sale . . . ."). Accordingly, the court finds that the sale of all of the membership interests in a limited liability company transfers the entirety of the entity, including both known and unknown assets (unless specifically excluded), to the purchaser. Here, MPA Recital C provides a list of Excluded Assets that includes certain office buildings, land, and all of Westroc, LLC's cash at the time of closing. Because the UUPA claim was not included among these Excluded Assets, it was necessarily transferred to Kilgore with the sale of the membership interests.

## III. Westroc, Inc.'s Claim Was Never Assigned or Otherwise Transferred to Holdco; Accordingly, the Claims Assignment was a Nullity and Spurlino Lacks Standing

For Westroc, Inc.'s antitrust claim to have been assigned or transferred to Holdco, there would have to be a specific assigning document to that effect.[7] *See Emerson Elec. Co. v. Le Carbone Lorraine, S.A.*, 642 F. Supp. 2d 381, 385 (D.N.J. 2008), *vacated in part on other grounds*, No. 05-6042 (JBS), 2009 WL 313754 (D.N.J. Feb. 4, 2009) ("[I]n order to establish valid assignment of an antitrust claim a party must establish that either (1) the assigning

---

[7] In fact, even if the MPA did represent an asset purchase, in the absence of an assignment or other transfer of the claims that Westroc, LLC owned, its eventual merger into Kilgore would mean that Kilgore became the successor in interest to all claims owned by Westroc, Inc. *See* Utah Code Ann. § 48-3a-1026(1) (following a merger of a limited liability company, "all property of each merging entity vests in the surviving entity without transfer, reversion, or impairment.")

documents make express reference to the assignment of antitrust claims or (2) the assignment of litigation claims is unambiguous and all-inclusive." (citation omitted)). Spurlino is unable to point to any transaction whereby the UUPA claim was assigned or transferred to Holdco. And during oral argument, Spurlino admitted that in fact there are no documents assigning the UUPA claim to Holdco.

## CONCLUSION AND ORDER

Westroc, Inc.'s claim under the UUPA was transferred first to Westroc, LLC—by operation of the conversion— and then to Kilgore—by operation of the MPA. Because Holdco never succeeded to any claims of Westroc, Inc., it could not have assigned them to Spurlino. Accordingly, the court concludes that Spurlino lacks standing to bring his UUPA claim and HEREBY ORDERS:

1. Defendants' Motion for Summary Judgment (Dkt. No. 79) is GRANTED;

2. Spurlino's Motion for Partial Summary Judgment (Dkt. No. 117) is DENIED;

3. Count I of Spurlino's Amended Complaint is DISMISSED; and

4. Judgment will be entered in favor of Defendants.

IT IS SO ORDERED.

DATED August 1, 2017.

Judge Jill N. Parrish
United States District Court Judge